# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01213-COA

**MILES CUNNINGHAM**                                                                **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                                              **APPELLEE**

DATE OF JUDGMENT:                    09/13/2023
TRIAL JUDGE:                         HON. KENT E. SMITH
COURT FROM WHICH APPEALED:           MARSHALL COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:             AMY KATHRYN PIETROWSKI
                                     WILLIAM D. MASSEY
ATTORNEY FOR APPELLEE:               OFFICE OF THE ATTORNEY GENERAL
                                     BY: KATY TAYLOR SARVER
DISTRICT ATTORNEY:                   BENJAMIN F. CREEKMORE
NATURE OF THE CASE:                  CRIMINAL - FELONY
DISPOSITION:                         AFFIRMED - 09/16/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., EMFINGER AND WEDDLE, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Following a jury trial, Miles Cunningham was convicted of first-degree murder and sentenced to life imprisonment.  On appeal, he argues the trial court erred by refusing his self-defense and lesser-included-offense jury instructions; by denying his motion to dismiss the indictment, exclude evidence, or give a jury instruction based on the State's failure to preserve evidence; by allowing the State to cross-examine him about a statement of the victim; and by not granting a mistrial and "expressing sympathy" to the victim's mother in open court.  He also argues that the evidence is insufficient to support his conviction, that the verdict is against the weight of the evidence, and that cumulative errors warrant a new trial.

For the reasons discussed below, we find no reversible error and affirm.

**STATEMENT OF FACTS**

¶2.     Around 1:30 a.m. on December 28, 2020, Miles Cunningham kicked in the door to the Byhalia apartment of his on-again-off-again girlfriend, Melissa Pate, and found Pate and Lazarus Lawson having sex on the couch. Cunningham attacked Lawson and ultimately shot Lawson in the back, killing him.

¶3.     Detective Victoria Jackson of the Byhalia Police Department responded to the shooting, arriving at approximately 1:52 a.m. EMTs were already on the scene and loading Lawson into a helicopter. Jackson made contact with Lawson "to find out the nature of his injuries." Jackson stated that EMTs were having difficulty treating Lawson "because of the nature and state of mind that he was in." Jackson tried to talk to Lawson, but she had difficulty communicating with him because he "was in an excited state." Lawson later died from the gunshot wound.

¶4.     Jackson learned that the shooting took place in Pate's second-story apartment and began photographing the crime scene. There was a pool of blood at the bottom of the stairs where Lawson had fallen after leaving the apartment. At the door to Pate's apartment, Jackson observed that it was "clear that it took some tremendous force in order to" gain entry into the apartment. The door frame was "split and separated" "on both sides," and the lock itself "was actually on the floor inside the apartment." Pate's and Lawson's clothes were strewn on a couch just inside the apartment that faced the door of the apartment.

¶5.     Jackson observed two sets of bullet holes inside the apartment. One projectile had

2

entered the wall in the living room behind the couch and continued into the adjacent bedroom before coming to rest in the bedroom closet. The second projectile had entered a different living room wall and continued into the neighboring apartment. Jackson testified that the apartment was in disarray and agreed "it was pretty clear that a tussle" had occurred.

¶6. After securing the scene and photographing the apartment, Jackson questioned Pate about the shooting. Jackson stated that Pate was crying inconsolably, "extremely hysterical," and "in fear for her life." Pate said that "Miles Cunningham had shot Lazarus Lawson." Several hours later, United States marshals apprehended Cunningham. A Marshall County grand jury later indicted Cunningham for first-degree murder.

¶7. Jackson learned that "SkyCop," a video surveillance system, captured and maintained multiple angles of video footage of the apartment complex. Jackson obtained and reviewed footage from around the time of the shooting. Jackson observed Cunningham's car enter the parking lot around 1:20 a.m. Cunningham exited the car and walked up the stairs toward Pate's apartment, but the cameras did not show the door to Pate's apartment. Moments later, lights in adjoining apartments turned on, and shortly thereafter Lawson stumbled down the stairs and collapsed at the bottom of the stairs. Cunningham walked back down the stairs, stepped around Lawson, returned to his car, and drove away "at a high rate of speed."

¶8. A series of Facebook messages between Cunningham and Pate's nephew, Deandre, were admitted into evidence at trial. On December 26 and 27, Deandre reached out to check in on Cunningham and encouraged him to try to reconcile with Pate. In messages several hours after the shooting, Cunningham told Deandre that he had found Pate "with another

3

[man]." Cunningham stated, "Just know I f***ed up and . . . I wasn't after [Pate]."

¶9.     Pate testified that she first met Cunningham in college and dated him briefly in 2017. They resumed dating and moved in together in April 2019. In December 2019, Pate learned that Cunningham was seeing another woman. When she confronted Cunningham, he "got in [her] face and . . . threatened . . . to punch [her] in the face." Pate ordered Cunningham to move out of her apartment. Cunningham then "gathered his things and . . . punched a hole in the wall" on his way out. Cunningham moved into a nearby apartment in the same complex. Cunningham's mother was the manager of the apartment complex, and she insisted on changing Pate's locks after the incident. According to Pate, Cunningham's mother was familiar with his anger because "[h]e was very violent towards" her as well. Although Cunningham moved out, he and Pate remained in a relationship, and Pate became pregnant with Cunningham's child. However, Cunningham's infidelity continued.

¶10.    In April 2020, Cunningham's mother hosted a gathering at her apartment. As Cunningham walked Pate back to her apartment, they argued again about Cunningham's infidelity, and then each went to their respective apartments. Cunningham called Pate later and wanted to continue the conversation, but Pate told him she did not "want to do this anymore." Cunningham asked, "So bitch, you're going to leave me?" Pate stated she did not appreciate being called names, and Cunningham responded that he would "come and f*** [her] up and beat [her] ass." Cunningham then came to Pate's apartment and beat on the door, but Pate would not let him in. Cunningham then entered the apartment through a window, confronted and verbally abused Pate, and threatened to hit her. Cunningham's

4

family and police eventually arrived and forced him to leave.

¶11. In November 2020, Pate and Cunningham were both at a family Thanksgiving dinner, but they were not on speaking terms due to Cunningham's continued infidelity. At some point, Cunningham became angry with Pate, and Pate volunteered that she and their daughter would go back to her apartment. Cunningham's family tried to hold him back, but he reached over them and hit Pate, and Pate responded by hitting Cunningham with a bottle. Cunningham then grabbed Pate around her neck and choked her to the point she could not breathe. Pate pressed charges against Cunningham, but when Cunningham began threatening to commit suicide, Pate reconciled with him again for their daughter's sake.

¶12. Pate encouraged Cunningham to seek help for his anger, and Cunningham promised he would do so. At one point, they agreed they were no longer in a relationship, but Pate admitted that she resumed a sexual relationship with him because she feared "he would take his own life." Pate stated that she, Cunningham, and their daughter all spent Christmas together because their daughter and Cunningham "had a very strong relationship." Cunningham also continued to help Pate financially. Pate was adamant that although she and Cunningham continued spending time together, Cunningham "was never allowed to come to [her] apartment without" first receiving her permission.

¶13. Pate met Lawson on a dating app around October 2020. On December 27, 2020, Pate agreed to go on a date with Lawson. Cunningham called Pate several times while she and Lawson were at dinner, but Pate did not answer. After dinner, Pate and Lawson decided to watch a movie at Pate's apartment, and they drove to Pate's apartment in their separate cars.

5

Cunningham called Pate again as she was driving, and she told him she had gone out to eat alone because "she didn't feel comfortable with telling him [she] was with another guy." Cunningham did not believe her and stated she "was probably with some new guy on a date," which she denied. Cunningham said he had planned a couple's massage for her birthday the next day, but Pate said he should have asked her first "because we were broken up." Cunningham said he would come to her apartment around midnight, but Pate told him not to come over because she just wanted to relax and watch TV. Cunningham responded, "[O]h, okay," and the phone call ended.

¶14. At Pate's apartment, Pate and Lawson watched a couple of movies and eventually began having sex. Suddenly and without any knock or warning, Cunningham kicked in the door and attacked Lawson, punching and kicking him.

¶15. Pate began shouting at Cunningham to get out of the apartment and tried to push him out the front door. Lawson said, "[H]ey, I didn't know. I didn't know nothing about this. She said she didn't have a man. . . . I'm going to leave." But Cunningham "just drew for his weapon." Lawson then took off "running down the hallway," trying to get away from Cunningham. Pate testified that "[t]here was never a struggle over the firearm" and that "[n]o one ever had the firearm but [Cunningham]." As Lawson tried to run away, Cunningham shot at him but missed. Pate testified that she "kept pulling on [Cunningham] trying to stop him from shooting [Lawson]." Lawson realized that the only way out of the apartment was the front door, so he came back down the hallway and tried to run past Cunningham to the front door. But Cunningham fired the gun twice more, and Pate began

6

to see blood. Lawson fell to the ground and was on his back. Pate testified that Cunningham stood over Lawson, and Lawson said, "Please don't kill me. I've got kids." Cunningham told Lawson to "get the f*** out," and Lawson stumbled out of the apartment. Pate testified that Cunningham then turned to her, pointed the gun at her head, and pulled the trigger. However, the gun "just made a clicking noise." Cunningham then said, "Well, f*** it. I'm not going to kill you. I'm done with you. I hate you. You could have told me you had another [man]. F*** you." Cunningham then left the apartment.

¶16.    When Pate felt it was safe, she went to her neighbor's apartment to ask for help. Her neighbors called 911. The police arrived, and she talked to Detective Jackson. She provided a written statement on the afternoon of December 28, and in February 2021, she provided a supplemental statement that described her relationship with Cunningham.

¶17.    Dr. Mark LeVaughn testified as an expert in the field of forensic pathology. He testified that Lawson had multiple abrasions on his face and extremities and suffered a gunshot wound to his back. The bullet entered Lawson's back just below the shoulder blade and traveled downward from right to left. The bullet hit Lawson's liver, kidney, and lung, causing Lawson's death. LeVaughn classified the entry wound as a "distant wound," meaning that the gun was greater than three feet away from Lawson when fired.

¶18.    Cunningham testified in his own defense. In December 2020, he was working as a security guard for a private security company. Cunningham testified that his job required him to carry his personal handgun at all times.

¶19.    Cunningham testified that the "most important people" in his life were Pate, his

7

daughter, and Pate's other daughter. He treated Pate's other daughter as his own and considered himself "a positive father figure in her life." He admitted that his relationship with Pate had "take[n] a turn for the worse" due to his infidelity. He stated his "anger issues" began when he was deployed to Kuwait from 2018 to 2019 while serving in the U.S. Army. When he returned home, he "notice[d] a difference" in himself and "started going to therapy in and out of the VA for anger management." He testified he was diagnosed with a form of PTSD known as IED, or intermittent explosive disorder. In December 2020, he was taking medicine for PTSD but was not consistently attending therapy.

¶20. He acknowledged that his relationship with Pate was rocky and that they argued frequently. He confessed to punching a hole in Pate's wall, and he stated they both had "said hurtful things to each other." He acknowledged that he "put [his] hands on" Pate in November 2020 after she threw a beer bottle at him, but he testified that they later reconciled. He testified that although he and Pate were not "together" in December 2020, they were "still seeing each other" and were "intimate from time to time." He claimed that Pate had given him a key to her apartment. He spent December 25-27 with Pate and the children, and he and Pate talked about their relationship. On December 27, he told Pate that he would see her on December 29, the day after her birthday.

¶21. Later that evening, he called Pate from work. She told him "she was out," and he "jokingly" asked if she was on a date. Pate said she was not on a date, but she was "a little hostile." He told her to enjoy her birthday and that he had gotten her a gift. She asked when he could bring it, and he told her that because he was working a double shift, he would bring

8

it to her the day after her birthday. Cunningham claimed that Pate said he could bring the gift to her apartment and leave it inside on a table. Cunningham testified that based on that statement, he assumed that Pate wanted him to bring the gift to her apartment *that night*, so he decided he would take the gift to her apartment during his break.

¶22. Cunningham left work at around 1 a.m. He testified that he "expect[ed] [Pate] to be asleep" when he got to her apartment. Cunningham testified that he walked up the stairs to her apartment, put the key in the lock, and opened the door, but the door only "opened about a quarter of an inch because the latch was on the door." Cunningham "heard a man moaning" inside, and he testified that his "mind snapped, not toward jealously" but because he "thought [Pate] was being hurt." Cunningham "kicked the door in" and saw Pate and Lawson having sex. Cunningham "felt . . . enraged and betrayed" and "proceeded to hit Mr. Lawson." Cunningham testified that he and Lawson "began to tussle," and Pate "jumped on [his] back," "trying to get [him] off of [Lawson]." Cunningham claimed that when he flipped Pate off his back, her foot knocked his gun out of his holster. Cunningham claimed that Lawson then "reached for" the gun, so he "dove on top of [Lawson] to get it back." Cunningham testified that he felt like Lawson "might use [the gun] and turn it on [him]." He testified the gun fired twice "in the middle of the struggle," and he realized he needed "to get control before somebody [got] seriously hurt." Cunningham claimed that he "twisted Mr. Lawson's grip to get the gun back" and "gained control of the gun." He stated Lawson "lunged at [him] and knocked [him] off balance," and Cunningham fired the gun "out of fear." He said that he fired the gun "in small quarters in the kitchen," and the bullet hit

9

Lawson in the back. Cunningham testified that he told Lawson to get out, and Lawson did so. He testified that he told Pate that she "should have told [him] she was moving on to somebody else" and that he was "done" with her. He denied that he threatened Pate or pointed his gun at her. He left the apartment and was arrested about eight hours later.

¶23. Cunningham testified he did not plan to shoot and kill anyone that night and did not "want any of this to happen." He stated he did not intend to use his weapon that night and only shot Lawson "in fear when [he] was knocked off balance."

¶24. The jury found Cunningham guilty of first-degree murder and not guilty of the attempted murder of Pate. The court sentenced him to life imprisonment for first-degree murder. Cunningham filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

## ANALYSIS

### I. Jury Instructions

¶25. Cunningham first argues that the trial court erred by refusing his proposed self-defense instruction because his testimony supported the instruction. In the alternative, he argues that the trial judge erred by refusing his proposed instructions on the lesser-included offenses of imperfect self-defense manslaughter and culpable-negligence manslaughter. At Cunningham's request, the trial court did instruct the jury on the lesser-included offense of heat-of-passion manslaughter.

¶26. In general, we review the refusal of a jury instruction for an "abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010). "[T]he instructions actually given must

10

be read as a whole.  When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found. There is no error if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law." *Id*. at 73-74 (¶20) (quoting *Rubenstein v. State*, 941 So. 2d 735, 784-85 (¶224) (Miss. 2006)).  "In homicide cases, the trial court should instruct the jury about a defendant's theories of defense, justification, or excuse that are supported by the evidence, no matter how meager or unlikely."  *Evans v. State*, 797 So. 2d 811, 815 (¶11) (Miss. 2000) (quoting *Manuel v. State*, 667 So. 2d 590, 593 (Miss. 1995)).  The defendant, though, must "offer *some evidence* to support his . . . theory before the trial court [is] obligated to instruct the jury on it."  *Nelson v. State*, 284 So. 3d 711, 718 (¶26) (Miss. 2019) (emphasis added).  The trial court properly refuses a requested instruction that is not supported by the evidence.  *Id*.

¶27.    We apply a different standard of review regarding the refusal of a lesser-included-offense instruction:

> We review a trial judge's denial of a lesser-included-offense jury instruction de novo.  While a defendant is entitled to have jury instructions given which present his theory of the case, . . . the court may refuse an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.  To be entitled to a lesser-included-offense instruction, a defendant must point to some evidence in the record from which a jury reasonably could find him not guilty of the crime with which he was charged and at the same time find him guilty of a lesser-included offense.  We must view the evidence in the light most favorable to the defendant, draw all reasonable inferences in his favor, and take into account that the jury may not be required to believe any evidence offered by the State.  But if no reasonable jury could have found the defendant guilty of the lesser-included offense, we will uphold the denial of the proposed instruction.

*Smith v. State*, 171 So. 3d 542, 546 (¶10) (Miss. Ct. App. 2015) (quotation marks omitted)

(quoting *Gilmore v. State*, 119 So. 3d 278, 286 (¶13) (Miss. 2013)).

### A.    Self-Defense

¶28.    Cunningham requested a jury instruction on the justification of self-defense, but the trial court refused the instruction, stating that "it was not supported by the proof." The trial court further stated that Cunningham "never said he was scared or acting in self-defense" and did not "recall him testifying in fear of his life" but only that "he was outraged."

¶29.    However, Cunningham did testify that he shot Lawson "out of fear" that Lawson would get control of his gun and turn it on him. Following oral argument on appeal, we directed the parties to address whether Cunningham was entitled to a self-defense instruction given his own testimony that he was the initial aggressor.

¶30.    The Mississippi Supreme Court has stated that "Mississippi adheres to the common law rule that an aggressor is precluded from pleading self-defense." *Simmons v. State*, 805 So. 2d 452, 473 (¶30) (Miss. 2001) (quoting *Layne v. State*, 542 So. 2d 237, 244 (Miss. 1989)). Thus, in *Simmons*, the Supreme Court held that the defendant was "precluded from pleading self-defense" because there was "ample testimony that placed [him] as the aggressor." *Id.*; *accord Gunn v. State*, 374 So. 3d 1206, 1213 (¶25) (Miss. 2023) ("[A]n aggressor is precluded from pleading self-defense."); *Shaw v. State*, 139 So. 3d 79, 94 (¶58) (Miss. Ct. App. 2013) (Carlton, J., specially concurring) ("[T]he law in Mississippi provides that an initial aggressor is not entitled to assert the defense of self-defense."); *Beale v. State*, 2 So. 3d 693, 698 (¶12) (Miss. Ct. App. 2008) (applying the same rule); *see also* Miss. Code Ann. § 97-3-15(4) (Rev. 2020) ("A person *who is not the initial aggressor* and is not engaged

12

in unlawful activity shall have no duty to retreat before using deadly force [in self-defense] if the person is in a place where the person has a right to be . . . ." (emphasis added)).

¶31. Similarly, the uncontradicted evidence in this case showed that Cunningham was the initial aggressor. Cunningham himself testified that he became "enraged" and felt "betrayed" when he saw Lawson and Pate having sex and immediately attacked and began to strike Lawson. Pate also testified that Cunningham kicked in the door and immediately began hitting and kicking Lawson. Accordingly, under the longstanding rule reaffirmed in *Simmons* and other cases, Cunningham was not entitled to plead self-defense.

¶32. To be sure, "[a]n aggressor can still claim self-defense if he by 'unequivocal acts abandons his original position of aggression and discloses that fact to his adversary in some appropriate manner.'" *Nelson v. State*, 362 So. 3d 1077, 1081 (¶15) (Miss. Ct. App. 2018) (quoting *Wilkinson v. State*, 143 Miss. 324, 339, 108 So. 711, 714 (1926) (Ethridge, J., dissenting)) (citing 40 C.J.S. *Homicide* § 195 (2018) ("[E]ven if a person is an aggressor, he or she can lose that status by clearly withdrawing from a fight and can evince that desire to withdraw by either word or act so long as the person's intentions are clear.")), *rev'd on other grounds*, 284 So. 3d 711 (Miss. 2019). But in this case, there is *no evidence* that Cunningham *unequivocally* "abandon[ed] his original position of aggression" *and* "disclose[d] that fact to [Lawson] in some appropriate manner." *Id.* Indeed, Cunningham concedes that there is no such evidence. Cunningham testified that at one point during the altercation he *intended* to holster his weapon and end the fight, but he concedes that his alleged intent was never disclosed or made known to Lawson.

¶33.    If there is any evidence that the defendant was *not* the initial aggressor, and there is some evidence to support a claim of self-defense, the defendant is entitled to self-defense instructions.  The jury, not the court, must resolve any conflicts in the evidence.  However, in this case, the evidence—*including Cunningham's own testimony*—is uncontradicted that Cunningham was the initial aggressor, that he attacked Lawson without provocation, that he never unequivocally abandoned his status as the aggressor, and that he never disclosed to Lawson in any manner that he intended to end the attack.  Therefore, there was no factual basis for Cunningham's proposed self-defense instruction, and the trial court did not abuse its discretion by refusing it.  *See McCoy v. State*, 196 So. 3d 1007, 1010 (¶11) (Miss. Ct. App. 2015) (affirming the refusal of a jury instruction because there was "no factual basis for the instruction" and because "an appellate court may affirm a trial court's decision if the correct result was reached, even if the trial court reached the result for the wrong reasons" (brackets omitted)).

## B.    Imperfect Self-Defense

¶34.    The trial court also refused Cunningham's proposed instruction on the lesser-included offense of imperfect self-defense manslaughter.  "Unlike true self-defense, imperfect self-defense is not a defense to a criminal act." *Ronk v. State*, 172 So. 3d 1112, 1126 (¶22) (Miss. 2015).  "Rather, under the theory of imperfect self-defense, an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." *Id*. (quotation marks omitted).  "In other words, a defendant is guilty of imperfect self-defense manslaughter if he kills the

14

victim based on a subjective, but objectively unreasonable, belief that the killing is necessary to prevent death or great bodily harm." *Slaughter v. State*, 305 So. 3d 424, 431 (¶24) (Miss. Ct. App. 2020).

¶35. Thus, the only difference between true or perfect self-defense (justifiable homicide) and imperfect self-defense (manslaughter) is the reasonableness (or unreasonableness) of the defendant's belief that his actions were necessary to prevent death or great bodily harm. *See Nelson*, 284 So. 3d at 716 (¶19) (quoting *Brown v. State*, 222 So. 3d 302, 307 (¶¶20-21) (Miss. 2017)). For true self-defense, the defendant's belief "must be *objectively* reasonable," but for imperfect self-defense, his belief need be "*only subjectively*, in his . . . own mind, reasonable." *Brown*, 222 So. 3d at 307 (¶¶20-21); *see also e.g.*, *People v. Barton*, 906 P.2d 531, 538 (Cal. 1995) ("The sole difference between true self-defense and [imperfect] self-defense is" the reasonableness of the defendant's "fear" of "the imminent infliction of death or great bodily injury." (quotation marks omitted)); *State v. Gomaz*, 414 N.W.2d 626, 630 (Wis. 1987) ("[P]erfect self-defense and imperfect self-defense differ only in regard to the factual determination of 'reasonableness' . . . .").

¶36. Because the only difference between true self-defense and imperfect self-defense is the reasonableness of the defendant's belief that the killing was necessary to prevent death or great bodily harm, it follows that an initial aggressor is also precluded from claiming imperfect self-defense. *See Commonwealth v. Busanet*, 54 A.3d 35, 56 (Pa. 2012) ("[A] claim of imperfect self-defense must satisfy all the requisites of justifiable self-defense (*including that the defendant was not the aggressor* . . .), with the exception that imperfect

15

self-defense involves an unreasonable, rather than a reasonable, belief that deadly force was required to save the actor's life." (emphasis added)); *People v. Rangel*, 367 P.3d 649, 675 (Cal. 2016) ("[B]ecause defendant was the initial aggressor and the victim's response legally justified, defendant could not rely on [imperfect] self-defense as a ground for voluntary manslaughter."). As explained above, the evidence in this case, including Cunningham's own testimony, was uncontradicted that Cunningham was the initial aggressor and attacked Lawson without provocation. Therefore, the trial court did not abuse its discretion by refusing Cunningham's proposed instruction on imperfect self-defense.

¶37. We reiterate that if there is conflicting evidence regarding the identity of the initial aggressor, the issue and any claim of imperfect self-defense must be submitted to the jury. Here, however, there is no conflict in the evidence regarding Cunningham's status as the initial aggressor.

### C.     Culpable-Negligence Manslaughter

¶38. Cunningham next argues that the trial court erred by refusing his proposed instruction on the lesser-included offense of culpable-negligence manslaughter. The trial court refused the instruction, stating that an instruction on heat-of-passion manslaughter was the only appropriate manslaughter instruction based on the evidence at trial.

¶39. "Manslaughter by culpable negligence has been defined as 'such gross negligence as to evince a wanton or reckless disregard for the safety of human life, or such an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness.'" *Lewis v. State*, 295 So. 3d 521, 539 (¶57) (Miss. Ct. App. 2019)

16

(quotation marks omitted) (quoting *Chandler v. State*, 946 So. 2d 355, 361 (¶22) (Miss. 2006)); *see* Miss. Code Ann. § 97-3-47 (Rev. 2020) ("Every other killing of a human being, by the act, procurement, or culpable negligence of another, and without authority of law, not provided for in this title, shall be manslaughter.").

¶40. However, "[a]n intentional act that causes death cannot constitute culpable negligence." *Smith*, 171 So. 3d at 546 (¶10) (quoting *Goff v. State*, 778 So. 2d 779, 782 (¶6) (Miss. Ct. App. 2000)). Thus, in *Goff*, this Court stated:

> Goff contends that the trial court should have given his requested instruction on culpable negligence [manslaughter]. Goff is incorrect. He testified he intended to punch and kick Carson. An intentional act that causes death cannot constitute culpable negligence. *Hurns v. State*, 616 So. 2d 313, 321 (Miss. 1993). As such there was no evidence to submit the case to the jury on the theory of culpable negligence, and denying the instruction was not error.

*Goff*, 778 So. 2d at 782 (¶6).

¶41. Here, Cunningham testified that he shot Lawson "[o]ut of fear" because he feared that Lawson would take the gun from him and turn it on him. Lawson never testified that he negligently or accidentally fired the gun. As stated above, "[a]n intentional act that causes death cannot constitute culpable negligence." *Smith*, 171 So. 3d at 546 (¶10) (quoting *Goff*, 778 So. 2d at 782 (¶6)). Therefore, the trial court did not err by refusing Cunningham's proposed culpable-negligence manslaughter instruction.

## II. Lost Body-Camera Footage

¶42. Cunningham filed a pretrial motion to dismiss the indictment or, in the alternative, to exclude testimony, arguing that the State had violated his right to due process by losing important evidence. Specifically, Cunningham alleged that the State had lost footage from

17

a body camera worn by a patrol officer at the crime scene, a video recording of a February 2021 meeting between Detective Jackson and Lawson's brother, and video recordings of Jackson's interviews of Pate and Deandre in February 2021. At a pretrial hearing on the motion, Jackson testified that a patrol officer wore a body camera at the crime scene on December 28, 2020, but Jackson did not believe the officer obtained statements from any witnesses. Jackson testified that she used her body camera to record a subsequent meeting with Lawson's brother, but he was primarily concerned about the status of the investigation and a possible civil lawsuit. Jackson testified that she also used her body camera to record interviews of Pate and Deandre on February 13, 2021. Pate and Deandre made written statements that day, and Deandre provided the messages he exchanged with Cunningham in the days leading up to the killing. Their written statements and the messages were all disclosed to the defense in discovery. Jackson testified that after the body camera videos were uploaded to the Byhalia Police Department's computer system, the department "switched computers." Videos relevant to ongoing cases were supposed to be downloaded to external hard drives, but "there was an error with one of the hard drives," and Jackson lost videos from almost all of her ongoing cases.

¶43. The trial court denied the motion to dismiss or exclude testimony. The court found that there was no evidence that the lost videos were exculpatory, that comparable evidence was available, and that there was no evidence that the videos were lost or destroyed in bad faith. The court stated that it would consider whether any jury instruction was appropriate based on the evidence at trial.

¶44. At the jury instruction conference, Cunningham requested an instruction on the State's duty to preserve evidence, which would have permitted the jury to infer that "absent evidence would [have been] favorable to [Cunningham]." However, the trial court refused the instruction, again finding that there was no evidence that the lost videos were exculpatory, that comparable evidence was available, and that there was no showing that the videos were lost in bad faith.

¶45. "The State has the duty to preserve evidence, but that duty is limited to that evidence which might be expected to play a significant role in the suspect's defense." *Northup v. State*, 793 So. 2d 618, 623 (¶16) (Miss. 2001) (quotation mark omitted). We use a three-prong "test to determine whether the State's failure to preserve evidence violated the defendant's right to due process":

> (1) the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed; (2) the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and (3) the prosecution's destruction of the evidence must have been in bad faith.

*Robinson v. State*, 247 So. 3d 1212, 1234 (¶56) (Miss. 2018). The defendant must satisfy all three prongs of this test to establish a violation of his due process rights. *Childs v. State*, 133 So. 3d 348, 350 (¶10) (Miss. 2013).

¶46. In the present case, the trial court applied the correct test and found that none of its three prongs were satisfied. There is ample evidence to support the trial court's findings. There is no evidence that any of the missing evidence was exculpatory or was lost or destroyed in bad faith. Moreover, comparable evidence was available, and there is no

19

evidence that the missing videos would have disclosed anything material beyond what was in written witness statements and crime scene photos. Accordingly, the trial court did not err by denying Cunningham's pretrial motion or refusing his proposed jury instruction.

### III. Lawson's Statement to Detective Jackson

¶47. Prior to trial, Cunningham filed a motion in limine to preclude testimony that as EMTs were preparing Lawson to be transported, Lawson stated, "Man, I've got six kids. I just want my mom." Cunningham argued that the statement was irrelevant and would only be offered "to engender sympathy." *See* MRE 401–403. The trial court agreed that Lawson's statement was not relevant in and of itself. However, the court stated that Lawson's statement might become relevant if Pate's anticipated testimony that Lawson begged for his life during the altercation with Cunningham was challenged at trial. The court stated that it would take that issue up at trial.

¶48. As noted above, Pate testified at trial that Lawson begged Cunningham not to kill him, stating, "Please don't kill me. I've got kids." However, Cunningham later testified that Pate was lying and that Lawson said no such thing. The prosecutor then stated that "[i]n lieu of calling a rebuttal witness" to testify about Lawson's "dying declarations," which were "consistent" with Pate's testimony about what Lawson "said in that kitchen," he would like to ask Cunningham whether he was "familiar with that information." The court stated, "I'll allow it." Cunningham did not object to the prosecutor's request at that time. The prosecutor then asked Cunningham if he was "aware of the statement by [Detective] Jackson" about what Lawson said as he was being treated by EMTs and loaded into a helicopter.

20

Cunningham answered in the negative. The prosecutor then handed Cunningham a copy of Jackson's report, which stated that as EMTs were treating Lawson, he said, "Man I got six kids. I just want my momma." The prosecutor asked Cunningham if Jackson's report "refresh[ed] [his] recollection." Cunningham answered, "No, sir. May I explain why?" Cunningham then stated that Jackson's report was about what Lawson said as he was being treated by EMTs and loaded into a helicopter, "so he [(Lawson)] didn't say none of that to me." After some additional questions, the following exchange occurred:

> Q. Do you disagree that Victoria Jackson reported that when he was struggling with the medics, that he said, man, I've got six kids. I just want my momma --
>
> [Defense counsel]: He wasn't present.
>
> [Prosecutor]: Can I finish the question before you object?
>
> BY THE COURT: Okay. Let him finish the question, you can object, okay? You may finish the question. Please start it over again so that I can follow it.
>
> . . . .
>
> Q. Did it refresh your recollection that Victoria Jackson reported that Mr. Lawson said when he was struggling with the medics, "Man I've got six kids. I just want my momma"?
>
> A. That's what he said that to her. He didn't say that to me.
>
> [Defense counsel]: Your Honor, may we approach?
>
> BY THE COURT: Yes, sir.
>
> (Bench conference)
>
> [Defense counsel]: Your Honor, he wasn't present when that happened. He couldn't have personal knowledge of it.
>
> BY THE COURT: Okay. Well, then he can answer it. He has about three

21

different times that he didn't know. But he was asked the question, he goes, no, he just read it. But he asked him, you previously gone over this report and he said yes. But I know he wasn't there. He'd already left.

[Defense counsel]: That's what he's asking.

BY THE COURT: That is stuff for you to argue to the jury.

[Defense counsel]: Okay.

BY THE COURT: All right. Thank you.

(End of bench conference.)

There were no further questions about Lawson's statement.

¶49. On appeal, the State argues that this "evidence was probative of Pate's character for truthfulness and went to her credibility." The State further argues that "Cunningham testified that Pate had been untruthful, but the evidence of Lawson's statement to Detective Jackson corroborated Pate's testimony."

¶50. However, we do not see how Lawson's statements to EMTs while he was being treated "corroborated Pate's testimony" that Lawson previously made a similar statement at a different time. We also fail to see why Cunningham should have been cross-examined about a statement that Lawson made to others outside his presence. Thus, we agree with Cunningham that the statement was not relevant.

¶51. Nonetheless, we agree with the State's alternative argument that any error was harmless. "To warrant reversal, two elements must be shown: error, and injury to the party appealing." *Gray v. State*, 799 So. 2d 53, 61 (¶30) (Miss. 2001). "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the

party . . . ." MRE 103(a). "We will not reverse a conviction based on a harmless error." *Chaupette v. State*, 136 So. 3d 1041, 1047 (¶12) (Miss. 2014). "Error is harmless when it is trivial, formal, or merely academic, and not prejudicial to the substantial rights of the party assigning it, and where it in no way affects the final outcome of the case . . . ." *Gray*, 799 So. 2d at 61 (¶30). "[I]t is prejudicial, and ground for reversal, only when it affects the final result of the case and works adversely to a substantial right of the party assigning it." *Id.*

¶52. Here, although Lawson's statement as he was being treated was likely irrelevant, we do not see how it prejudiced Cunningham's defense. Pate had already testified—without objection—that Lawson begged for his life, stating, "Please don't kill me. I've got kids." We fail to see how evidence that Lawson later made a similar statement adversely affected Cunningham's substantial rights. Accordingly, any error was harmless.

## IV. The Trial Judge's Comments to Lawson's Mother

¶53. During Cunningham's testimony, Lawson's mother apparently began "sobbing," and defense counsel requested a bench conference. The following exchange then took place:

> [Defense counsel]: I'm sorry. His mom is sitting in the back sobbing. Can we take a break?
>
> BY THE COURT: No, sir. We're not taking a break. But I will do this.
>
> (End of bench conference.)
>
> BY THE COURT: Ms. Lawson, I understand the emotion of this and I respect that, but if you're going to have a problem keeping composure, I'm going to ask that you step out of the courtroom during this. Again, it's your decision. I don't know how to better address that. It's taking the attention away from the witness.
>
> [Defense counsel]: Thank you.

23

[Lawson's mother]: I'll be better.

BY THE COURT: I'm sorry for your loss. Okay. You may proceed . . . .

¶54. On appeal, Cunningham argues the trial judge improperly consoled Lawson's mother by saying he was "sorry for [her] loss" and "potentially expressed his bias towards the State's case, possibly prejudicing the jury." He argues that the trial court should have taken a short recess or declared a mistrial. The State argues that Cunningham failed to request a mistrial and that the trial court addressed the issue appropriately.

¶55. We agree with the State that this issue is procedurally barred. "It is . . . well settled that when anything transpires during the trial that would tend to prejudice the rights of defendant, he cannot wait and take his chances with the jury on a favorable verdict and then obtain a reversal of the cause [on appeal] because of such error . . . ." *Blackwell v. State*, 44 So. 2d 409, 410 (Miss. 1950). The defendant "must ask the trial court for a mistrial upon the happening of such occurrence [if it] is of such nature as would entitle him to a mistrial." *Id.*; *accord, e.g.*, *Willis v. State*, 300 So. 3d 999, 1008 (¶¶27-28) (Miss. 2020). Here, Cunningham did not move for a mistrial. Indeed, he made no objection to the manner in which the trial court handled the matter. Accordingly, the issue is waived on appeal.

V. **Sufficiency of the Evidence**

¶56. We review challenges to the sufficiency of the evidence de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). "We view the evidence in the light most favorable to the prosecution to determine whether rational, reasonable fair-minded jurors could have found that the State proved each essential element of the crime." *Poole v. State*,

24

46 So. 3d 290, 293 (¶20) (Miss. 2010) (quotation marks and emphasis omitted). "[A]ll credible evidence supporting a defendant's guilt should be accepted as true, and all favorable inferences drawn from the evidence must be reconciled in the prosecution's favor." *Johnson v. State*, 904 So. 2d 162, 166 (¶7) (Miss. 2005). "We are not required to decide—and in fact we must refrain from deciding—whether we think the State proved the elements." *Poole*, 46 So. 3d at 293-94 (¶20). "Rather, we must affirm the conviction as long as there is sufficient evidence for a rational juror to find that the State proved all elements of the offense." *Williamson v. State*, 375 So. 3d 1158, 1167 (¶19) (Miss. Ct. App. 2023) (citing *Poole*, 46 So. 3d at 293-94 (¶20)).

¶57.    Cunningham argues that there is insufficient evidence to convict him of first-degree murder because there is insufficient evidence that he killed Lawson with "deliberate design." He argues that he is, at most, guilty of heat-of-passion manslaughter.

¶58.    To convict Cunningham of first-degree murder, the State was required to prove that he killed Lawson "without the authority of law" and "with deliberate design to effect" Lawson's death. Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2020). "Deliberate design" simply "connotes an intent to kill." *Holliman v. State*, 178 So. 3d 689, 698 (¶19) (Miss. 2015). "Deliberate design may be formed very quickly, and perhaps only moments before the [fatal] act . . . ." *Bowser v. State*, 182 So. 3d 425, 430 (¶12) (Miss. 2015) (quotation marks omitted). In general, the defendant's intent may be "demonstrated by the act itself, surrounding circumstances, and expressions made by the actor with reference to his intent." *Adams v. State*, 291 So. 3d 405, 409 (¶11) (Miss. Ct. App. 2020) (quotation mark omitted). Moreover,

25

"[i]t is well-established that . . . deliberate design[] may be inferred from the use of a deadly weapon. Deliberate design, as a matter of law, may be inferred through the intentional use of any instrument which based on its manner of use, is calculated to produce death or serious bodily injury." *Holliman*, 178 So. 3d at 698 (¶19) (brackets, citations, and quotation marks omitted). Ultimately, the "[i]ntent to . . . commit a crime is . . . a question of fact to be gleaned by the jury from the facts shown in each case." *Shanklin v. State*, 290 So. 2d 625, 627 (Miss. 1974).

¶59. In contrast, a killing "in the heat of passion" is manslaughter. Miss. Code Ann. § 97-3-35 (Rev. 2020). A "heat of passion" is defined as a "state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from a grade of murder to that of manslaughter." *Jones v. State*, 39 So. 3d 860, 866 (¶36) (Miss. 2010) (quoting *Mullins v. State*, 493 So. 2d 971, 974 (Miss. 1986)). "Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror." *Id.* To establish a "heat of passion," there must be such provocation and "circumstances as would indicate that a normal mind would be roused to the extent that the reason is overthrown and that passion usurps the mind destroying judgment." *Id.* at 867 (¶36) (quoting *Windham v. State*, 520 So. 2d 123, 127 (Miss. 1987)).

¶60. Cunningham notes that "[t]he Mississippi Supreme Court has found catching a spouse in the act of adultery, without any prior suspicion of unfaithfulness, and slaying the adulterer or paramour 'on the spot' as sufficient provocation for heat-of-passion manslaughter."

*Hogan v. State*, 89 So. 3d 36, 40 (¶17) (Miss. Ct. App. 2011) (citing *Denham v. State*, 218 Miss. 423, 429-30, 67 So. 2d 445, 447-48 (1953)). However, the Supreme Court also cautioned that it did "not mean to hold that the mere fact that an offended spouse comes upon the other in the act of adultery, and kills one or both of them, would reduce the crime from murder to manslaughter in all cases, nor would it be a license to murder. The facts and circumstances of each case are to be considered." *Denham*, 218 Miss. at 430, 67 So. 2d at 448.

¶61. We conclude that the evidence presented at trial in this case was sufficient for a rational jury to find that Cunningham killed Lawson with deliberate design. For one thing, Pate was not Cunningham's "spouse." *Hogan*, 89 So. 3d at 40 (¶17). At trial, Cunningham admitted that he and Pate were not living together and that he himself was "seeing other people during this time period." Moreover, Cunningham testified that he "figured" that Pate was also seeing other people. Pate testified that when she talked to Cunningham on the phone that very night, he asked her whether she was on a date with someone else, although she denied it. Thus, there was ample evidence that Cunningham and Pate were not in any sort of exclusive relationship and that Cunningham went to Pate's apartment armed with a gun and suspicious that she was on a date with another man. Cunningham did not "catch[] a spouse in the act of adultery," and this case does not involve "unfaithfulness," an "adulterer," or a "paramour." *Hogan*, 89 So. 3d at 40 (¶17). Moreover, Cunningham *did* have a "prior suspicion" that Pate was seeing someone else. *Id.*

¶62. In addition, Pate's testimony was sufficient for the jury to find that Cunningham acted

27

with deliberate design. Pate testified that Cunningham fired multiple rounds at Lawson even as Lawson stated that he would "leave," apologized that he "didn't know" Pate had "a man," and attempted to flee from Cunningham. Pate testified that she also tried to prevent Cunningham from killing Lawson. Nonetheless, Cunningham shot Lawson in the back as he attempted to flee the apartment. Based on the evidence presented at trial, a rational jury could have found beyond a reasonable doubt that Cunningham killed Lawson with deliberate design rather than in the heat of passion. Accordingly, the trial court did not err by denying Cunningham's motion for judgment notwithstanding the verdict.

## VI.    Weight of the Evidence

¶63.    Cunningham also argues, in the alternative, that he is entitled to a new trial because the jury's verdict is against the overwhelming weight of the evidence. For challenges to the weight of the evidence, we "view the evidence in the light most favorable to the verdict and disturb the verdict only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Little v. State*, 233 So. 3d 288, 289 (¶1) (Miss. 2017). "We do not reweigh evidence. We do not assess the witnesses' credibility. And we do not resolve conflicts between evidence. Those decisions belong solely to the jury." *Id*. In addition, we "review the trial court's decision to grant or deny a new trial for an abuse of discretion." *Id*. at 292 (¶21).

¶64.    In light of all the evidence discussed above, we cannot say that the jury's verdict was contrary to the overwhelming weight of the evidence. The jury was entitled to assess the credibility of Pate and Cunningham and resolve the conflicts in the evidence. "Those

28

decisions belong solely to the jury." *Id.* at 289 (¶1). Therefore, the trial court did not abuse its discretion by denying Cunningham's motion for a new trial.

## VII. Cumulative Error

¶65. Cunningham's final argument is that his conviction should be reversed based on cumulative error. "The cumulative-error doctrine holds that individual errors, which are not reversible in themselves, may combine with other errors to make up reversible error, where the cumulative effect of all errors deprives the defendant of a fundamentally fair trial." *Powers v. State,* 371 So. 3d 629, 719 (¶380) (Miss. 2023) (quotation marks omitted). However, Cunningham has identified, at most, one harmless error. Therefore, this argument also fails. *Brown v. State*, 336 So. 3d 134, 147 n.14 (Miss. Ct. App. 2020) (holding that the cumulative-error doctrine is inapplicable when the defendant identifies only one harmless error); *accord Page v. State*, 269 So. 3d 440, 455 n.13 (Miss. Ct. App. 2018); *Keys v. State*, 219 So. 3d 559, 568 n.8 (Miss. Ct. App. 2017).

## CONCLUSION

¶66. There is sufficient evidence to support Cunningham's first-degree murder conviction, the jury's verdict is not contrary to the overwhelming weight of the evidence, and Cunningham has failed to show any reversible error in his trial. Accordingly, Cunningham's conviction and sentence are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR.**